## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>VICTOR G. DUQUE, )<br>)<br>)<br>Defendant. ) | NO. CR-09-265-D |

### **ORDER**

Before the Court is Defendant's Motion to Suppress Statements and Evidence [Doc. No. 14]. The government timely responded to the Motion and, on October 29, 2009, the Court conducted an evidentiary hearing.

Defendant, Victor G. Duque, is charged in a three-Count Indictment with possession of approximately 1,361 grams of marijuana with intent to distribute the same, as well as possession of a firearm and ammunition after having been convicted of a felony. The marijuana, firearm and ammunition were obtained during a warrantless search of two residences; the searches occurred after Defendant was detained and arrested. Defendant also made incriminating statements to law enforcement officers.

Defendant argues that the evidence must be suppressed because: 1) his warrantless arrest was not supported by probable cause and thus violated his Fourth Amendment rights; 2) the warrantless searches of the residences also violated his rights; and 3) his statements to law enforcement officers were not preceded by *Miranda*[1] warnings and a valid waiver. The government contends that the

---

[1] *Miranda v. Arizona,* 384 U.S. 436 (1966).

arrest was lawful because it was preceded by a valid traffic stop and probable cause; it further argues the officers had consent to search the two residences. In addition, the government contends Defendant was read his *Miranda* rights, and waived the same, prior to any questioning by the officers.

Testimony at the hearing:

At the October 29, 2009 hearing, the Court heard the testimony of Sgt. Craig Engles and Sgt. Brett Henry, Oklahoma City Police Department officers assigned to the Gang Enforcement Unit. The Court also heard the testimony of Defendant.

Sgt. Engles testified that he has been an Oklahoma City police officer for approximately thirteen years; he has had extensive training regarding drug interdiction, both as a police officer and as a member of the armed forces. He also testified that he is familiar with the odor of unburned or fresh marijuana and the manner in which it is packaged.

According to Sgt. Engles, he attended a June 8, 2009 lineup briefing at the Oklahoma City Police Department. During the lineup briefing, Sgt. Engles and the other officers learned that a confidential informant had told police Victor Duque, who was known by the street name, "Tiny," was residing at 1629 S.W. Binkley in Oklahoma City. The informant also said Victor Duque was dealing drugs from the residence at that address and possessed guns located there. According to the informant, Victor Duque drove a white Dodge pickup truck with a black tailgate. Sgt. Engles was also advised that Victor Duque is not a United States citizen and is illegally residing here. According to Sgt. Engles, he checked the computer data system known as the Oklahoma Law Enforcement Telecommunication System and confirmed that Victor Duque had no valid license to operate a vehicle. Sgt. Engles was also aware that Victor Duque was listed on the Violent Gang and

Terrorist Offender list ("VGTOF") as a gang member, and officers were advised he should be considered armed and dangerous. According to Sgt. Engles, he also viewed previous booking photographs of Victor Duque.

Sgt. Engles testified that, at approximately 8:00 p.m. on June 8, he was in his vehicle with Sgt. Gayhart in the vicinity of Southwest 29th Street and Pennsylvania Avenue in Oklahoma City when they observed a white Dodge pickup with a black tailgate traveling south on Pennsylvania. Because the vehicle description matched that provided by the confidential informant, and based on their review of previous booking photographs, the officers suspected the driver might be Victor Duque. They followed the vehicle; it turned East onto S.W. Binkley and turned into a driveway at 1629 S.W. Binkley, the address also provided by the informant as the location where Victor Duque resided. When the truck stopped, the driver immediately exited and started walking toward Sgt. Engles, who had exited his vehicle. Three passengers remained in the truck. As he exited his vehicle, Sgt. Engles drew his weapon because Victor Duque had been described as armed and dangerous. According to Sgt. Engles, he recognized Defendant as Victor Duque from his booking photos; he asked if Defendant had a driver's license, and Defendant replied that he did not. Defendant was instructed to lie down on the ground; he complied, and Sgt. Engles handcuffed him and placed him in the back seat of his patrol car.

Sgt. Engles approached the Dodge truck; the driver's door remained open, and Sgt. Engles smelled a strong odor of fresh marijuana. He also observed an approximately one-inch long marijuana bud on the lid of the closed ashtray on the truck's console.

In the interim, other police officers with the Gang Enforcement Unit had arrived at the scene. They removed the three passengers from the truck; Sgt. Engles did not talk with the passengers.

According to Sgt. Engles, he returned to his vehicle and began reading Defendant his *Miranda* rights from the card utilized by the Oklahoma City police. Sgt. Engles testified that, before he began reading, Defendant started talking to him. Sgt. Engles stopped him, and proceeded to read the *Miranda* rights from the card. Sgt. Engles testified that Defendant stated he understood his rights and was willing to talk with police without an attorney being present; Sgt. Engles did not ask Defendant to sign an acknowledgment form.

Sgt. Engles spoke to Defendant in English, and Defendant also spoke English; at no time did Defendant indicate any difficulty in understanding his rights or any subsequent questions posed by Engles. Nor did Defendant exhibit any signs of incoherence or incapacity. He was not promised leniency and was not threatened. Defendant told Sgt. Engles that the truck belonged to him, although it was registered in his girlfriend's name. Defendant also said he currently resided at 1629 S.W. Binkley, but was in the process of moving to S.W. 22nd street to live with his mother. He said the passengers in his truck were helping him move that day.

According to Sgt. Engles, he asked Defendant if he had guns in the S.W. Binkley house, and Defendant said he did not; when Sgt. Engles asked Defendant if the officers could search the house, Defendant said he did not care but that, because he was moving, they should probably ask his landlady, who lived next door; he also said his key to the house was on the keychain in the truck.

Sgt. Engles testified that Sgt. Gayhart spoke to the woman next door at 1633 S.W. Binkley; she confirmed she was Defendant's landlady. When speaking to the landlady, Sgt. Gayhart did not draw his weapon or make threats to her. She said the officers could search the house, but to "leave her out of it." While the other officers searched the house, Sgt. Engles remained in his car with Defendant, who remained handcuffed and seated in the back seat.

Inside the house, the officers found three packages of fresh marijuana; when weighed, each weighed approximately one pound. The packages were found in a hidden compartment of a wet bar in the house. They also found ammunition in the house. Defendant told Sgt. Engles he had discovered the ammunition when he moved into the house, and he hid it under a drawer so his child would not find it. The officers also found clothing, bedding, and some tires; Defendant said those items, and the food in the house, belonged to him.

When the search was complete, Sgt. Engles asked Defendant if there was additional marijuana; Defendant said there should be a total of about three pounds. He also said he owed $500 per pound to the person for whom he was selling the marijuana.

While Sgt. Engles was talking with Defendant, other officers had handcuffed the truck passengers. One of the passengers, Alejandra Martinez, said they were helping Defendant move to S.W. 22nd Street; she agreed to show the officers that location.

Sgt. Brett Henry, a police officer also assigned to the Gang Enforcement Unit, testified that he was present and assisted in handcuffing the truck occupants. He testified that he spoke to Ms. Martinez, who agreed to accompany the officers to S.W. 22nd and show them the house to which Defendant was moving. Sgt. Henry and other officers proceeded to that location while Sgt. Engles remained with Defendant at the S.W. Binkley address. Upon arrival at the house identified by Ms. Martinez, Sgt. Henry approached the house, which was located at 2330 S. W. 22nd Street; a female identifying herself as Yesenia Duque answered the door. Sgt. Henry told her Defendant had been arrested at the Binkley location; she said Defendant is her brother, and she confirmed he was moving to 2330 S.W. 22nd Street. She told Sgt. Henry that she rented that house and had agreed to let Defendant live there; she told him she planned to continue paying the rent and utility bills for the

house while Defendant stayed there. Sgt. Henry asked her for permission to enter and search the house, and she agreed. She did not limit the scope of the search, and she also agreed to a search of her vehicle, which was parked in the driveway.

Sgt. Henry's conversation with Yesenia Duque occurred outside the S.W. 22nd Street house, in the front yard of a residential neighborhood in public view. According to Sgt. Henry, he did not display his weapon or threaten Ms. Duque in any manner. He stayed with her outside the house while other officers conducted a search. During that search, the officers found a .357 revolver containing ammunition; the gun was under a night stand in a bedroom. They also found papers showing Defendant's name.

Defendant testified that a police car followed him to the S.W. Binkley address on June 8; he believed the events occurred around 9:00 p.m. He admitted that he had no driver's license, and said he was initially told he was being arrested for that violation. According to Defendant, he did not know there was a marijuana bud in his truck; he said his girlfriend had driven it earlier that day. He also testified that Yesenia Duque did not have a key to the house on S.W. 22nd Street, and she was waiting there for him to arrive. He testified that Yesenia Duque did not own the S.W. 22nd Street house, and that someone else had been living there before he began moving in. Prior to June 8, 2009, Defendant did not pay rent or utility bills related to the S.W. 22nd Street house; he testified that he intended to pay rent and utilities after moving in.

Defendant denied that Sgt. Engles advised him of his *Miranda* rights. He also denied giving the officers permission to search the S.W. Binkley residence or the S.W. 22nd Street residence. He said he knew they had to have a warrant to enter his residence.

Analysis:

When a defendant asserts a motion seeking to suppress evidence, the government bears the burden of establishing, by a preponderance of the evidence, that the evidence was the product of a lawful search. *United States v. Roberts*, 14 F. 3d 502, (10th Cir. 1993), *cert. denied,* 514 U.S. 1043 (1995). The government also bears the burden of proving that a defendant was given *Miranda* warnings and that a defendant's statement was voluntary. *United States v. Pettigrew*, 468 F. 3d 626, 633 (10th Cir. 2006).

Validity of the traffic stop:

A traffic stop is valid under the Fourth Amendment if it is "based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *Swanson v. Town of Mountain View,* 577 F. 3d 1196, 1201 (10th Cir. 2009) (citing *United States v. Callarman*, 273 F. 3d 1284, 1286 (10th Cir.2001)."[O]ur cases are clear that the reasonableness of the traffic stop is an objective inquiry. We do not consider the subjective motivations of law enforcement-those motivations are irrelevant." *Swanson*, 577 F. 3d at 1201 (citing *United States v. Botero-Ospina*, 71 F. 3d 783, 787 (10th Cir.1995)). The "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *Id.* ( citing *Botero-Ospina*, 71 F. 3d at 787).

In this case, Sgt. Engles testified that he knew Defendant did not have a valid driver's license, and Defendant admits he had no license. When Sgt. Engles observed Defendant driving a vehicle which had been identified as belonging to Defendant, he was justified in stopping him because operation of a vehicle without a license is a violation of state law. *Swanson*, 577 F. 3d at

1201. Accordingly, the traffic stop of Defendant was lawful.

Validity of the arrest:

It is not disputed that the officers did not obtain a warrant prior to arresting Defendant. A warrantless arrest violates the Fourth Amendment unless the government proves, by a preponderance of the evidence, the existence of an exception to the warrant requirement. One of the recognized exceptions to the warrant requirement is the existence of probable cause; the officers must have had probable cause to believe a crime had been committed, was in progress, or was about to be committed. *Cortez v. McCauley*, 478 F. 3d 1108, 1115(10th Cir. 2007). "Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Valenzuela*, 365 F. 3d 892, 896 (10th Cir.2004) (internal quotation marks omitted).

In this case, the officers had probable cause to stop and to arrest Defendant for the traffic violation which they observed. However, Defendant questions the validity of his arrest for marijuana possession with intent to distribute.

Law enforcement officers noting an odor of marijuana emanating from a vehicle are justified in detaining individual occupants of the vehicle, as such circumstances create a reasonable suspicion of criminal activity. *United States v. Woods*, 2009 WL 3262018, at * 3 (10th Cir. Oct. 13, 2009) (unpublished opinion) (citing *United States v. Bradford*, 423 F. 3d 1149, 1156-57 (10th Cir. 2005)). The "distinctive smell" of drugs, together with other factors, supports probable cause to arrest an individual. *United States v. Hugaboom*, 984 F.2d 1083, 1084 (10th Cir. 1993)(methamphetamine odor); *United States v. Romero*, 692 F.2d 699 (10th Cir. 1982)(odor of marijuana in defendants' van,

plus anonymous tip and observations that justified stop of van, sufficient to support probable cause to arrest the defendants). Where, in addition to the odor of drugs, officers have other knowledge which supports probable cause, the search and/or arrest is valid; under such circumstances, the collective knowledge of several officers may support probable cause. *United States v. Cervine*, 347 F. 3d 865, 871 (10th Cir. 2003).

In this case, the evidence shows that the officers had been informed during their lineup briefing that an informant had disclosed the Defendant was selling drugs and possessed guns at the 1620 S.W. Binkley house. The officers had also been told that Defendant drove a white Dodge pickup truck with a black tailgate. Sgt. Engles confirmed that Defendant was listed on VGTOF as a known gang member who should be considered armed and dangerous. In addition, Sgt. Engles testified that Officer Coniglione, another Gang Enforcement Unit officer, had previously conducted a field interview with Defendant and was familiar with him and his background.

The Court concludes that, based on the evidence and the governing law, the officers had probable cause to arrest Defendant for both the traffic violation and the marijuana charge. The odor of marijuana emanating from Defendant's truck and the visible presence of the marijuana bud, combined with the officers' collective knowledge regarding Defendant was sufficient to cause them to believe Defendant was engaged in criminal activity involving marijuana. Accordingly, the Court concludes that the officers had probable cause to arrest Defendant.

<u>Whether Defendant was given a valid *Miranda* warning:</u>

Defendant argues that any statements he made in connection with his detention and arrest must be excluded because he was not given a *Miranda* warning. Sgt. Engles testified, however, in considerable detail about the circumstances surrounding the reading of the *Miranda* rights to

Defendant. He stated that Defendant began volunteering information to him and that he stopped him in order to first read the *Miranda* warning from the card he utilized. He described the card in detail, including the color of the paper on which it was printed; during his testimony, he read the language from a similar card, noting that it was printed on paper of a different color than that from which he read Defendant's rights to him.

Having heard the testimony of the witnesses, the Court concludes that the evidence establishes Defendant was given a valid *Miranda* warning. There is no evidence to suggest that Defendant did not understand his rights, nor is there evidence that any subsequent statements were the product of coercion or duress. The Court concludes that Defendant's *Miranda* rights were not violated.

<u>The validity of the searches:</u>

It is a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), *quoting Flippo v. West Virginia*, 528 U.S. 11, 13 (1999) (*per curiam*) and *Katz v. United States,* 389 U.S. 347, 357 (1967).

Consent is "one of the specifically established exceptions to the requirements of both a warrant and probable cause." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The prohibition against a warrantless entry and search "does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 181

(1990). To be valid, consent must be "freely and voluntarily given." *United States v. Sandoval*, 29 F. 3d 537, 539 (10th Cir. 1994). The government has the burden of proving that consent was given, and that such consent was knowing, voluntary, and free from coercion; whether voluntary consent was given is a question of fact determined by the totality of the circumstances. *United States v. Lyons,* 510 F. 3d 1225, 1239 (10th Cir. 2007). To meet its burden, the government (1) "must proffer clear and positive testimony that consent was unequivocal and specific and freely given" and (2) "prove that this consent was given without implied or express duress or coercion."*Lyons*. 510 F. 3d at 1239 (citing *Zubia-Melendez*, 263 F. 3d at 1162); *see also United States v. Rodriguez-Lopez*, 2007 WL 926846, at **4 (10th Cir. Mar. 29, 2007). The Court should consider whether the circumstances included the following:

> the threatening presence of several police officers; the brandishing of a weapon by an officer; some physical touching by an officer; the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory...interaction in a nonpublic place or small enclosed space; and absence of other members of the public.

*United States v. Abdenbi*, 361 F. 3d 1282, 1291 (10th Cir. 2004), *quoting United States v. Sanchez*, 89 F. 3d 715, 718 (10th Cir. 1996).

Sgt. Engles testified that he obtained consent to search from Defendant. However, at the request of Defendant because he was in the process of moving out of the residence, officers also approached Defendant's landlady, to attempt to obtain her consent. Regarding the other residence, as previously noted, officers sought consent from Defendant's sister, Yesenia Duque. The officers testified that, when asking the consent of the landlady at the S.W. Binkley residence and the consent of Yesenia Duque at the 22nd street residence, they did not display weapons or apply any force. Sgt. Engles testified that he observed Sgt. Gayhart approach the landlady, who resided next door to the

Binkley residence; Sgt. Gayhart did not display his weapon, but asked her if the officers could search the residence at issue. Sgt. Gayhart's conversation with the landlady occurred outside her house, in a residential neighborhood at a location which was visible to others.

Similarly, when Sgt. Henry approached the S.W. 22nd Street residence, Yesenia Duque answered the door. He asked her to come outside, and talked with her in the front yard. Their conversation also occurred in a residential neighborhood in full view of others. Sgt. Henry testified that he did not display a weapon while talking with Ms. Duque, nor did he touch or threaten her. According to Sgt. Henry, she was cooperative; she told him she was trying to assist Defendant and that she would continue to pay the rent and bills for him while he was living at the S.W. 22nd residence. According to Defendant and his counsel, Yesenia Duque leased the S.W. 22nd residence from its owner; she had been subletting it to a third party who was moving out so that Defendant could occupy the house.

The Fourth Amendment allows the "warrantless search of a home when law enforcement officials obtain the voluntary consent of an individual with <u>actual or apparent authority</u>." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (emphasis added) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181(1990) and *Schneckloth*, 412 U.S. at 219); *see also United States v. Romero*, 247 F. App'x 955, 959-60 (10th Cir. 2007). "Apparent authority exists when officers reasonably, even if erroneously, believe that the person consenting to the search has the authority to do so." *United States v. Thompson*, 524 F. 3d 1126, 1133 (10th Cir. 2008) (citing *Rodriguez*, 497 U.S. at 186, 188-89).

Based on the evidence presented, the Court concludes that, in these circumstances, the officers were justified in believing that both the landlady of the S.W. Binkley residence and Ms. Duque had authority to consent to the searches of those residences. The information provided by

Defendant, who identified his landlady for the officers, coupled with the fact that he was in the process of moving from the S.W. Binkley location, justified the officers' belief that the landlady could consent to a search. Because Yesenia Duque told Sgt. Henry she was renting the S.W. 22nd Street residence and would continue paying the rent and utility bills, he was justified in believing she had the authority to consent to a search of that residence. Although Defendant testified that Ms. Duque did not have a key to that house, Sgt. Henry testified that, when he arrived at the house, Ms. Duque was inside. The Court concludes that the officers reasonably believed, at the time of the searches, that the individuals who consented to the same had the authority to consent. Even if it were determined that their belief was erroneous, they were nevertheless justified in that belief at the time of these occurrences. *Thompson*, 524 F. 3d at 1133. The Court concludes that the two searches did not violate Defendant's Fourth Amendment rights.

Conclusion:

Having fully considered the testimony at the hearing in the context of the applicable law, the Court concludes that the government has satisfied its burden of proving that the officers had probable cause to stop and detain Defendant; they also had probable cause to arrest him. Furthermore, they obtained consent to search the two residences from individuals having actual or apparent authority to grant such consent. Finally, the Court finds no violation of Defendant's *Miranda* rights. Accordingly, Defendant's Motion to Suppress [Doc. No. 14] is DENIED.

IT IS SO ORDERED this  2nd  day of November, 2009.

TIMOTHY D. DEGIUSTI
UNITED STATES DISTRICT JUDGE